

Nick Mirr
Federal Defenders of Eastern Washington and Idaho
306 E. Chestnut Ave.
Yakima, Washington 98901
509.248.8920
Attorney for Andrei Stephanovich Borgheriu

United States District Court
Eastern District of Washington
Honorable Stanley A. Bastian

| | |
|---|---|
| United States,<br><br>    Plaintiff,<br><br> v.<br><br>Andrei Stephanovich Borgheriu,<br><br>    Defendant. | No. 4:22-CR-6040-SAB<br><br>Motion to Dismiss Indictment and Motion for Miscellaneous Relief<br><br>February 10, 2025 – 9:30 a.m.<br>Richland, WA —With Argument |

**Table of Contents**

I.   Introduction ........................................................................................................... 2

II.  Background ........................................................................................................... 2

III. Discussion ............................................................................................................. 4

    A.   The Ninth Circuit and the Supreme Court have made clear that the wire fraud statute applies only to schemes to defraud people of "traditional property interests." ........................................................................................................... 5

    B.   The SBA's desire to control the use of EIDL funds after disbursement is not a traditional property interest within the scope of § 1343. ...................................... 10

    C.   The Government's theory of prosecution allows for absurd results. ..................... 11

IV.  Conclusion ........................................................................................................... 13

## I. Introduction

Mr. Borgheriu moves this Court to dismiss Counts One and Two, pursuant to Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure. The counts (both of which allege wire fraud) must be dismissed because the government fails to allege that Mr. Borgheriu intended to deprive the Small Business Administration (SBA) of a "traditional property interest." Instead, the government alleges only an "intangible interest" in its theory that Mr. Borgheriu failed to use funds as the SBA intended.[1] However, both the Ninth Circuit and the Supreme Court have made clear that the wire fraud statute does not apply to "intangible interests" in property, but only to traditional property interests. The indictment therefore fails to charge him with a cognizable offense under 18 U.S.C. §3143.[2]

## II. Background

The material facts of this case are well set out in various filings. This brief will instead focus on those facts most relevant to the instant motion.

In the indictment, the Government sets out a "fraud in the inducement" theory. That is, the government alleges Mr. Borgheriu "applied for and received one EIDL on behalf of his company . . . with the intent to . . . convert the proceeds of the EIDL loan

---

[1] *See id*. at 4-6. Mr. Borgheriu does not concede that use of the EIDL to purchase this home was an improper use.

[2] Mr. Borgheriu intends to request special jury instructions on this issue, should the Court decline to dismiss Courts 1 and 2 at this stage of the proceedings.

for . . . [his] personal use and without intent to use the proceeds thereof for any authorized purpose."[3] The government further alleges that at the time Mr. Borgheriu applied for the EIDL, he intended to use the EIDL funds to purchase the residence in which he both resided and ran his business and that this was an improper use of the funds. In short, the theory pled in the indictment is that Mr. Borgheriu, knowing that he intended to spend the EIDL funds on a residence, made a misrepresentation to the government about how those funds would be used, and that such a misrepresentation caused the government to disburse said funds.[4]

In exchange for the loan, Mr. Borgheriu agreed to certain repayment terms. Namely that he would repay the loan over the next 30 years at a 3.75% interest rate.[5] Importantly, nowhere in the indictment does the government allege that Mr. Borgheriu schemed or intended to deprive the government of the benefit of their bargain—that is, that he lacked the intent to repay the loan. Indeed, the only alleged harm to the government that is included in the indictment is the allegation that Mr. Borgheriu used the EIDL funds for an "improper purpose."[6]

---

[3] *Id.* at 3.
[4] *See id.* at 5-6, ¶18.
[5] Exhibit 1(Loan Authorization & Agreement) at 2.
[6] *See generally* ECF No. 1.

### III.  Discussion

Rule 12(b)(3)(B)(v) authorizes a defendant to file a pretrial motion to dismiss the indictment before trial where it fails to state an offense. For an indictment to be sufficient, it must "first, contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and, second, enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense."[7] While the indictment may parrot the language of the statute, it must also contain "a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged."[8] If an indictment mirrors the language of the statute, but nonetheless omits an essential element of the charged offense, it may properly be dismissed.[9]

Here, the Indictment clearly tracks the language of 18 U.S.C. § 1343.[10] However, because it fails to allege that Mr. Borgheriu schemed or intended to deprive the government of a traditional property interest, it fails to state a cognizable offense.

---

[7] *Hamling v. U.S.*, 418 U.S. 87 (1974).
[8] *Id.* (quoting *U.S. v. Hess*, 124 U.S. 483, 487 (1888)).
[9] *U.S. v. Omer*, 395 U.S. 1087, 1088-89 (9th Cir. 2005)(finding that because the indictment failed to include an essential element of the bank fraud statute that had been determined in case law, it was properly subject to dismissal).
[10] *Compare* 18 U.S.C. § 1343 *and* Ninth Cir. Model Jury Instr. 15.35 (2023), *with* ECF No. 1.

A.  **The Ninth Circuit and the Supreme Court have made clear that the wire fraud statute applies only to schemes to defraud people of "traditional property interests."**

As an initial matter, the wire fraud and the mail fraud statutes contain essentially identical language, with the only material difference being that one involves the use of "the mail" and the other "wire."[11] As such, the Supreme Court has stated that "we apply the same analysis to both sets of offenses."[12] When interpreting the term "property" within the statutes, the Supreme Court has also "instructed that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."[13]

Turning to the scope of the mail and wire fraud statutes, beginning in 1987, the Supreme Court has made clear that these statutes touch only traditional property rights.[14] In *McNally*, the Supreme Court confronted a theory of prosecution that rested on the intangible right of the citizens of Kentucky to have their state's "affairs conducted honestly."[15] McNally had been charged with mail fraud for allegedly improperly influencing which insurance agencies from whom Kentucky would purchase policies to his own financial benefit.[16]

---

[11] *Compare* 18 U.S.C. § 1341 *with* 18 U.S.C. §1343.
[12] *Carpenter v. U.S.*, 484 U.S. 19, 25 n. 6 (1987).
[13] *Cleveland v. U.S.*, 531 U.S. 12, 25 (2000).
[14] *McNally v. U.S.*, 483 U.S. 350 (1987).
[15] *Id.* at 352.
[16] *Id.* at 352-353.

The Supreme Court reviewed the legislative history of the mail fraud statute concluded that it "clearly protects property rights, but does not refer to the intangible right of the citizenry to good government."[17] Specifically, the Court noted, "[i]nsofar as the sparse legislative history reveals anything, it indicated that the original impetus behind the mail fraud statute was to protect people from schemes to deprive them of their *money or property*."[18] The Court held § 1341 should be interpreted narrowly and "limited in scope to the protection of *property rights*. If Congress desires to go further, it must speak more clearly than it has."[19]

Congress responded the following year by enacting 18 U.S.C. § 1346—which explicitly protects the "intangible right of honest services."[20] Critically the only *intangible right* that Congress covered was that of "honest services[.]"[21] In the years since *McNally*, both the Ninth Circuit and the Supreme Court have been clear: the mail and wire fraud statutes only protect traditional property interests and *only* the intangible right to "honest services" explicitly protected by Congress.

In *Cleveland v. U.S.*, the Supreme Court similarly found that Louisiana lacked any traditional property interest in video poker licenses.[22] In finding the licenses were

---

[17] *Id*. at 356.
[18] *Id*. (emphasis added).
[19] *Id*. at 360 (emphasis added).
[20] *Cleveland v. U.S.*, 531 U.S. 12, 19-20 (2000).
[21] *Id*.
[22] *Id*. at 26-27 (holding "a Louisiana video poker license in the State's hands is not 'property'

outside the scope of § 1341, the Court noted that the "State's core concern" surrounding the licenses was "*regulatory*."[23] The Court went on to note that the "statute establishes a typical regulatory program. It licenses, subject to certain conditions, engagement in pursuits that private actors may not undertake without official authorization."[24] And while Louisiana certainly had the right to regulate such matters, "these intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to regulate."[25] That said, these rights were "far from composing an interest that has long been recognized as property[.]"[26] Of note, the Court did point out that there were other avenues outside of mail fraud, through which violators could be prosecuted.[27]

Perhaps most relevantly, in *U.S. v. Bruchhausen*, the Ninth Circuit considered a case similar to Mr. Borgheriu's.[28] Bruchhausen was a German citizen who engaged in a scheme to "smuggle American technology to Soviet Bloc countries."[29] Despite assuring the companies with whom he was dealing that he would only use the items purchased within the United States, Bruchhausen purchased the items with the intent

---

under § 1341.").
[23] *Id*. at 20 (emphasis in original).
[24] *Id*. at 21.
[25] *Id*. at 23.
[26] *Id*. (internal citation omitted).
[27] *Id*.
[28] 977 F.2d 464 (9th Cir. 1992)
[29] *Id*. at 466.

to ship them out of country.[30] The Ninth Circuit identified the "real question" as "whether the government's and manufacturers' interests [in keeping the property inside the U.S.] can be considered property rights within the meaning of the [wire fraud] statute."[31] In declining to find a traditional property right the court commented that "[w]hile they may have been deceived into entering sales they had the right to refuse, their actual loss was in control over the destination of their products after sale. It is difficult to discern why they had a property right to such post-sale control."[32] The court also recognized that while the company may understandably have a legitimate interest in where their products end up, "that interest in the disposition of goods it no longer owns is not easily characterized as property."[33] The Ninth Circuit ultimately concluded "that the interest of the manufacturers in seeing that the products they sold were not shipped to the Soviet Bloc in violation of federal law is not 'property' of the kind that Congress intended to reach in the wire fraud statute."[34]

Even more recently, a unanimous Supreme Court confirmed the narrow limits of the wire and mail fraud statutes to only traditional property interests. In *Ciminelli*, the government proceeded with a "right to control" theory of prosecution, alleging that

---

[30] *Id*.
[31] *Id*. at 467.
[32] *Id*.
[33] *Id*. at 468.
[34] *Id*.

Ciminelli had improperly schemed to "deprive [the] victim of potentially valuable economic information necessary to make discretionary economic decisions."[35] Despite the government's creative prosecution attempts, the Supreme Court once again stated clearly "that the federal fraud statutes criminalize only schemes to deprive people of traditional property interests. Because 'potentially valuable economic information necessary to make discretionary economic decisions' is not a traditional property interest, we now hold that the right-to-control theory is not a valid basis for liability under § 1343."[36] The Court clarified what the government must do: it "must prove not only that wire fraud defendants engaged in deception, but also that money or property was an object of their fraud."[37]

Just last year, the Ninth Circuit confirmed that "deception does not amount to fraud simply because it results in money changing hands."[38] The court concluded that it was error for the district court to not provide defense-requested jury instructions that explained "to support a conviction for fraud, a false statement must directly or indirectly deceive the victim about *the nature of the bargain.*"[39] The court explained, the "nature of the bargain requirement properly excludes from liability cases in which a

---

[35] *Ciminelli v. U.S.*, at 598 U.S. 306, 310 (2023).
[36] *Id*. at 308 (internal citation omitted).
[37] *Id*. at 312 (internal citation omitted).
[38] *U.S. v. Milheiser*, 98 F.4th 935, 944 (9th Cir. 2024).
[39] *Id*. at 945 (emphasis added).

defendant's misrepresentations about collateral matters may have led to the transaction but the buyer still got the product that she expected at the price she expected."[40] "A misrepresentation will go to the nature of the bargain if it goes to price or quality, or otherwise to *essential aspects of the transaction.*"[41]

### B. The SBA's desire to control the use of EIDL funds after disbursement is not a traditional property interest within the scope of § 1343.

On first glance, it would appear that the government could allege an offense on the idea that money was the "object of the [alleged] fraud."[42] This is the quintessential "overbroad" argument and misses the essence of the bargain that is alleged in the indictment.[43]

The interest the government asserts is the right to control the use of the funds after it disbursed them. This position mirrors that of *Bruchhausen* and *Cleveland*. The government seeks to control the use of property (i.e., EIDL funds) after it parted ways with money. Although the SBA may have a legitimate interest in how funds are expended after disbursement, both the Ninth Circuit and the Supreme Court have made clear that this is **not** a traditional property interest. Just like manufacturers in

---

[40] *Id.*
[41] *Id.* (emphasis added).
[42] *Ciminelli*, 598 U.S. at 312.
[43] *See U.S. v. Milheiser*, 98 F.4th 935, 938 (9th Cir. 2024) (holding that the government's "theory of fraud was overbroad because it did not require the jury to find that Defendants deceived customers about the nature of the bargain.").

*Bruchhausen*, the mere sense of feeling deceived does not support finding a "traditional property right." This is the lesson of *Bruchhausen*; even had the companies known of his malintent to support the Soviet Union, that was ***not*** enough to invoke § 1343. Similarly, without an injury to a "traditional property interest" in the instant case, it is immaterial that the SBA may never have disbursed the loan funds had it known of the funds' eventual use.

Further, the simple fact that money has changed hands does not necessitate a finding that the government or the SBA has been injured. Indeed, the government fails to allege at any place in the indictment that Mr. Borgheriu has ever had a scheme or intended to run off with the EIDL funds and never pay them back. In the end, that is fatal. Here, the government fails to allege any injury to a "traditional property interest" necessary for Mr. Borgheriu's alleged conduct to be actionable as wire fraud.

C. **The Government's theory of prosecution allows for absurd results.**

The Government's "fraud in the inducement" theory vastly expands the ambit of both the mail and wire fraud statutes. Such an expansion leads to absurd results.

Consider, for example, a family seeking to hire a babysitter on Care.com. The family interviews Steph via email, who tells them she intends to use the money she earns babysitting to pay for college. The family likes Steph's apparent responsibility and hires her, relying on her stated intentions of saving the money for her education. They agree to Venmo Steph money after she babysits. Steph provides the babysitting
- 11 -

services and does a nice job, feeding both kids and even cleaning up the house a bit before the parents come home. The parents send Steph $50 in exchange for her services. Steph, in a *horrible* turn of deceit, instead uses the money for a car… not her college fund. Incensed, the family contacts their local United States Attorney who prosecutes Steph for wire fraud relying on a fraud in the inducement theory, even though the family received totally adequate babysitting services.[44]

This hypothetical illustrates how taking the government's fraud in the inducement theory allows for absurd results and endorses vast expansion of federal authority. Under the exact same theory that the government now avers to prosecute Mr. Borgheriu, Steph could be prosecuted for perpetrating a similar type of "fraud."[45] Nobody disputes that there is moral or even contractual legitimacy to either the family's or the SBA's positions on what they might want to happen in the future. The remedies, though, are in contract, not a federal wire fraud charge. As it concerns the wire fraud statute and the "nature of the bargain" concept, both the family and the SBA received exactly what they bargained for—satisfactory babysitting services and assurances of repayment of a loan with interest. As there was no material misrepresentation in either case, the theories of prosecution fail.

---

[44] This hypothetical is largely borrowed from the recent oral argument in *U.S. v. Kousisis*. Transcript of Oral Argument at 24-25, *U.S. v. Kousisis*, No. 23-909 (Dec. 9, 2024).

[45] Indeed, the government appeared to concede at oral argument that, under a fraud in the inducement theory, the babysitter could be prosecuted federally for mail fraud. *See id.* at 64-69.

## IV. Conclusion

Because the government fails to allege a scheme to defraud the SBA of a traditional property right, Counts One and Two must be dismissed. However, should the Court decline to grant Mr. Borgheiru's motion to dismiss, it should nonetheless require that a jury instruction be given that clearly sets out the essential elements of the offense, including the "nature of the bargain" requirement discussed in *Milheiser*.

Dated: January 15, 2025.

Federal Defenders of Eastern Washington & Idaho
Attorneys for Andrei Stephanovich Borgheriu

s/ Nick Mirr
Nick Mirr, AT0014467
Iowa State Bar Ass'n
306 E. Chestnut Ave.
Yakima, Washington 98901
t: (509) 248-8920
nick_mirr@fd.org

## Service Certificate

I certify that on January 15, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Assistant United States Attorneys: Jeremy J. Kelley and Frieda K. Zimmerman.

s/ Nick Mirr
Nick Mirr, AT0014467
Iowa State Bar Ass'n
306 E. Chestnut Ave.
Yakima, Washington 98901
t: (509) 248-8920
nick_mirr@fd.org