# Appendix 2: Agency Response

U.S. Small Business Administration
Response to Report

2-1



U.S. SMALL BUSINESS ADMINISTRATION
WASHINGTON, DC 20416

**Date:** June 21, 2023

**To:** Hannibal "Mike" Ware, Inspector General

**From:** Bailey DeVries, Acting Associate Administrator, Office of Capital Access   BAILEY DEVRIES   Digitally signed by BAILEY DEVRIES Date: 2023.06.21 23:59:13 -04'00'

**Subject:** Response to COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape (Project 23010)

Thank you for the opportunity to review and respond to the Office of the Inspector General's (OIG) *Fraud Landscape* white paper. The U.S. Small Business Administration's (SBA) appreciates our partnership to strengthen all of SBA's programs, and especially the significant work we have done together to address fraud in the Paycheck Protection Program (PPP) and COVID Economic Injury Disaster Loan (COVID-EIDL) programs, as well as establish a strong fraud risk framework to strengthen SBA against future potential risks. However, we are concerned that the white paper's approach contains serious flaws that significantly overestimate fraud and unintentionally mislead the public to believe that the work we did together had no significant impact in protecting against fraud. The concerns are as follows:

1) **The paper only minimally acknowledges a critical aspect of SBA's fraud controls—the material fact that SBA's fraud controls improved dramatically over time**. While the white paper highlights 16 measures the SBA put in place in 2021 to stem the tide of the fraud attacks that were prominent at the outset of COVID-EIDL and PPP, the white paper does not provide a clear accounting of when the largest amounts of fraud took place and when the efforts in early 2021 to address it were taken. The statement: *"there was an insufficient barrier against fraudsters"* does not clarify the applicable time period for this conclusion. SBA believes a full accounting of our work together would provide critical context for fraud in the programs and when that fraud occurred. The vast majority of the fraud, 86% by SBA's estimate, occurred in the first nine months of COVID-EIDL and PPP. It is critical to clarify *when* SBA added controls and to emphasize which of those controls effectively protected against fraud. Such changes can provide valuable information to policymakers, as they consider effective controls for inclusion in legislation and at program launch for any future emergency program.

   You have previously highlighted this distinction. In January 2022 you stated:

   > *SBA is more prepared now than they've ever been in terms of the control environment… certainly much stronger than… at the onset of the pandemic… The agency has moved rather expeditiously to close out the majority of the [IG] recommendations.*

US v. BORGHERIU
CR-22-6040-SAB
Exhibit 1

SBA acknowledges the prior administration made decisions to prioritize speed and unnecessarily deflated the control environment for PPP and COVID-EIDL for the first several months of the programs. However, SBA introduced additional fraud controls over time and implemented a strengthened anti-fraud control framework in 2021. For example, SBA introduced pre-award application screenings beginning in January 2021, including automated screenings for PPP, adding tax transcript verification for COVID-EIDL, and running applications through the Treasury Department's Do Not Pay system. These controls saved billions. Additionally, SBA conducted a full review of all loans originated in 2020 to find likely fraud and refer it to your office. As a result of this work, SBA has found 86% of likely fraud originated in the first nine months of the programs. And while this white paper did not cover the Restaurant Revitalization Fund or Shuttered Venues Operator Grant programs, two new programs that were launched in 2021 had a combined fraud rate SBA estimates near half of one percent.

2) **The white paper's estimate of a 34% potential fraud rate for COVID-EIDL does not stand up against SBA's current repayment data: Only 12% of lending went to borrowers who are past due and yet to make payments, most of which is likely accounted for by real businesses that closed or are unable to repay.** Common-sense dictates that a bad actor would not fraudulently obtain a loan, only to repay it with interest. You have previously pointed out that fraudsters have no intention of repaying their loan (OIG Report 22-09), and that the true extent of fraud would become known once loans enter repayment (Deputy IG Testimony, March 2023). Now, in June 2023, an overwhelming majority of the portfolio by volume has passed deferral and is now obligated to repay. We recommend your office match the list of "potential fraudulent" COVID-EIDL borrowers with their actual repayment history, which OIG staff told SBA it considered but decided *not* to do as part of its white paper analysis. SBA would be happy to partner with your office in this analysis.

As of June 2023, only 12% of loan dollars went to borrowers who have not yet begun, but still may begin, repayment after their loan came due. Every other business has either fully repaid their loan or begun to do so (74%), or is still in the allowed deferment period (14%).

Importantly, most borrowers who do not repay their loans are not fraudulent; they are real businesses who did not make it through the turbulence of the pandemic and have no ability to repay. Indeed, early in the program, budget officials projected a default rate over one-third due to the likelihood of distress and closure under the unique, historic circumstances of the pandemic. Although SBA continues to estimate a higher-than-average non-repayment rate for the program overall, SBA's modeling relied on structural elements of the programs, such as Congress's decision to remove the requirement for personal guarantees for most loans, and the high likelihood of small business closures during the pandemic and years-long impact it had on the economy.

3) **Third, the white paper presents a summary of loans that are _potential fraud_ as if they were loans that are _likely fraud_.** The white paper provides an estimate of "potential fraud," but does not explicitly define the term except mentioning that OIG believes all loans identified "warrant investigation." It is important to provide clear definitions of terms like "potential fraud" to differentiate from "likely fraud" or "confirmed fraud." This is important both for policymakers and for the small business owners who may consider participating in future federal emergency loan programs. SBA invites the opportunity to work together with OIG on this issue so we have a common framework which will benefit all program stakeholders. Without such, the white paper leads the reader to mischaracterize the size of actual fraud in these programs.

SBA also reviewed all pandemic loans—and already conducted rigorous reviews of those with fraud indicators. SBA used automated screening similar to the tools used in the white paper to identify an initial set of files with anomalies, or "fraud indicators." <u>SBA's first sweep found over $400 billion worthy of further investigation—more than twice the amount OIG identified of worthy of further scrutiny. However, SBA's fraud identification and investigation did not stop there</u>. SBA then interrogated those files with over 3 million human-led reviews by trained professionals, many with long prior careers in law enforcement, complemented by data analytics. This extensive analysis revealed that the body of loans likely to be fraudulent is approximately $36 billion across PPP and COVID-EIDL. The white paper highlights that OIG has conducted over 1,000 investigations of pandemic loans so far. As the OIG team further scrutinizes its batch of anomalous files, it will find the false positive rate is high and the set of potentially fraudulent files will narrow as it did when SBA conducted our reviews.

To be clear, SBA believes that all the fraud indicators in OIG's white paper can be helpful in determining which loans require further review and analysis to determine when there is actual fraud, and we have used many of the same indicators as OIG in our _initial_ analysis. Nonetheless, SBA's <u>more than 3 million manual reviews to date have shown that many of these OIG indicators include a high percentage of false positives</u>. While SBA has identified loans that were not fraudulent within all 11 of the OIG's Fraud Indicators (e.g., typos, misunderstandings, circumstances for very small businesses, etc.), we focused the below examples on those indicators in the white paper for which a failure to acknowledge and account for a high propensity of false positives has the most material impact on OIG's inflated fraud estimate.

### Examples of False Positives

| # | Indicator Name | Example |
|---|---|---|
| 1 | Hold Codes | Hold code 8 (mismatch of entity name) identifies a business or entity where the company name provided does not match any of the listed identification credentials or provided application materials. Although this merits further review, SBA's historical manual reviews of loans with hold code 8 show that around over 75% of those with hold code 8 would likely be resolved due to the clear existence of borrower or lender data entry errors, or other valid factors.<br><br>SBA believes factoring in the historical results of the manual reviews of each hold code would help identify the "likely fraud" rather than just those loans with "fraud indicators." |
| 3 | Employer identification numbers | For EIDL loans, thousands of borrowers requested a loan increase that required approval from a different funding appropriation than the original loan. To manage this, the SBA opened a second loan with the same EIN to grant the increase using the correct appropriations. Many such loans, the total of which SBA estimates is valued at over $6 billion, would likely be counted as 'potentially fraudulent' under the white paper's methodology. |
| 4 | Bank accounts | The SBA encountered various data entry errors when reviewing loans associated with this hold code. For example, applicants would provide the standard routing information and the wire routing information, essentially providing the routing number twice without providing an account number. Additionally, the SBA found in its review of loans multiple instances of loans using the same bank account for legitimate reasons. |
| 5 | Defaulted/ No loan forgiveness | Through coordinated outreach from the SBA and Lenders, it was determined that many of these borrowers are intimidated by the complexity of the PPP forms, processes, and the formality of the forgiveness process.<br><br>To add complication, once PPP loan data was made public, many borrowers received a multitude of sales calls from both legitimate lenders and scammers. When the Lenders approached certain borrowers with routine communication alerting them to the need to file for forgiveness (email, US Mail, voicemail reminders, etc.) they were suspicious and untrusting.<br><br>Below are a few examples of feedback the SBA has received from the Lenders in this process as to why certain borrowers have not yet applied for forgiveness:<br><br>a) A change of email address, physical address, or phone numbers due to changes in personnel or life conditions (e.g., moving, marriage, etc.). |

| # | Indicator Name | Example |
|---|---|---|
|  |  | b) Many borrowers incorrectly believed they did not need to apply for forgiveness because their loans were relatively small ($150,000 of less) or heard the headlines that "blanket forgiveness" had or would occur.<br>c) A group of borrowers have passed away.<br>d) Some businesses have failed, and the borrowers did not understand the necessity to request forgiveness.<br>h) Borrowers who are suspicious they are being scammed. |
| 11 | Suspicious email addresses | Some borrowers X'ed out a portion of their email (e.g., JoseSmith@gmail.com as Joxxxxxth@gmail.com) in their initial application, perhaps in an attempt to avoid unwanted email outreach or as a glitch in a copy-paste. Upon review, the full email appeared valid with no indicia of fraud identified. |